UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

KARIN SMITH,

        Plaintiff,

        v.                       Case No. 11-C-0248

MICHAEL J. ASTRUE,

        Defendant.

DECISION AND ORDER REVERSING THE DECISION OF THE COMMISSIONER
AND REMANDING THE CASE

Plaintiff, Karin Smith, seeks judicial review of the final decision of the Commissioner of Social Security denying her Title II application for a period of disability and disability insurance benefits. Smith filed her application on January 7, 2008, alleging disability since June 1, 2004, due to fibromyalgia and arthritis. Her application was denied initially on March 12, 2008, and upon reconsideration on June 20, 2008. Smith and a vocational expert testified at an April 8, 2010, hearing, during which she was represented by counsel. The Administrative Law Judge (ALJ) who heard the matter found that Smith was not disabled because she could perform past relevant work. On September 22, 2010, the Appeals Council denied Smith's request for review, thereby making the ALJ's decision the final decision of the Commissioner.

On appeal, Smith argues that substantial evidence does not support the ALJ's residual functional capacity finding or the finding that Smith was able to perform past relevant work. In addition, Smith maintains that the ALJ's credibility finding was patently wrong. For the reasons set forth below, the decision of the Commissioner will be reversed.

FACTS

Smith, who was sixty years old on the date the ALJ issued his decision, had a high school education and some vocational college. (Tr. 27.) Previously, she worked as a data processor and a waitress. (Tr. 28-29.) In her disability report, Smith identified fibromyalgia and arthritis as her disabling conditions and explained that she could not bear weight or stand for a long period of time, that she had limited ability to reach or grasp, and that she experienced chronic pain. (R. 74.)

Although Smith claimed that she was unable to work because of her disabling condition on June 1, 2004, the record indicates that she was first treated on September 1, 2006, for complaints of decreased energy, muscle cramping, muscle ache after one hour of activity, and upper and lower extremity aches. (Tr. 64, 161.) At that time, she stated that she had not been seen by a doctor in four years. (Tr. 161.) Her examination was normal, including no joint swelling or limitation of motion, normal reflexes, and no sensory deficits. (Tr. 163.) The examining physician noted that she had symptoms consistent with fibromyalgia and prescribed amitriptyline titrating up from 10 to 50 mg. (Tr. 163.)

In a follow up appointment for hypertension monitoring, Smith reported that the amitriptyline "greatly helped her muscle cramps." (Tr. 160.) On January 5, 2007, Smith reported "feeling much better on amitriptyline 50 mg," and the myalgias had lessened. (Tr. 164.)

On July 20, 2007, Dr. Kasarabada noted that she had tolerated the amitriptyline very well. Smith reported that her pain was reduced, she could walk/exercise around the yard, return to typing school, her appetite had improved and she was sleeping better. (Tr. 155.)

2

Her examination was normal with no joint swelling, limitation of motion, or sensory deficits. (Tr. 156.) Dr. Kasarabada increased the amitriptyline dose to 100 mg. (*Id.*)

On January 4, 2008, Smith reported feeling too tired on the amitriptyline (100 mg) and preferred to reduce the dose. Dr. Margaret Holmes noted that the fibromyalgia was doing well with moderation of exercise and the amitriptyline. (Tr. 149-151.) However, on January 15, 2008, Smith reported that she was experiencing pain in the back of her neck, shoulders, and hands, with no relief from tylenol. (R. 148.) She associated the pain with the start of the rain the prior week. (*Id.*)

When Smith returned on March 17, 2008, she complained of numbness and tingling in both feet and pain in the legs. (Tr. 286.) Her arms felt heavy "like lead" and she was only able to sleep for 2-3 hour intervals. (*Id.*) During her examination on March 26, 2008, the nurse practitioner observed Smith in "obvious distress, rocking while seated, rubbing arms and thighs, difficulty rising from chair, limping gait." Although the amitriptyline had been reduced in January, it was increased to 100 mg. (Tr. 284.)

Dr. James Cole reviewed the medical evidence as part of the disability determination on May 27, 2008, and opined that Smith's allegations were not supportable. (Tr. 176.) Specifically, he found that the fibromyalgia was not severe. (Tr. 176.)

In October of 2008, Smith reported that she was doing well with no complaints. (Tr. 257.) With respect to the fibromyalgia, Smith was taking amitriptyline, flexeril, tramadol, and tylenol and continuing with the daily walking exercises and beginning yoga. (*Id.*) She reported sleeping approximately four hours per night with ongoing myalgia and generalized weakness though it was better controlled from the baseline. (*Id.*) In addition, Smith had learned to pace her ADL throughout the day, incorporate exercise, and eat a healthy and

3

balanced diet. (*Id.*) She had decreased her tobacco use to three cigarettes per day from one pack per day. (*Id.*) On examination, Smith had tender points, but no joint swelling or limitation of motion. The fibromyalgia was controlled and the leg cramps and weakness were manageable. (Tr. 260.)

On April 17, 2009, Smith reported that she had lost her husband the month before and that joint pain was the same or possibly worse due to the increased stress. (Tr. 245.) On examination, she had no tenderness over the joints and denied pain or cramping in her lower leg muscle with walking. (R. 248.) Smith also denied numbness, tingling, or burning of the feet or toes. (*Id.*)

Jayne Johnston conducted a OT outpatient functional capacity evaluation consult on November 23, 2009. (Tr. 225-29.) Johnston opined that Smith could perform light to medium work based on testing that including hand grip, coordination, bilateral lifting, mobility, and balance testing. (Tr. 225-29.) The physical demand levels cited by Johnston were defined by the Dictionary of Occupational Titles. (Tr. 227.) Light to medium requires exerting 35 pounds of force occasionally or 18 pounds frequently, or seven pounds of force constantly during an eight-hour workday. (*Id.*)

In her function report, Smith wrote that she watched the morning news and then divided her housework. (Tr. 85.) On various days, she would vacuum, dust, or do the laundry. (*Id.*) Once a week, Smith would water houseplants. (*Id.*) Any errands would be run in the early afternoon and then she would read, watch tv, or check the e-mail. (*Id.*)

During the hearing, Smith testified that it takes twenty or thirty minutes for her feet to stop tingling after she wakes up. (Tr. 31.) She uses an electric broom for the floors and vacuums. (Tr. 32.) In addition, she can dust, do dishes, cook, and wash clothes, but she

4

hates to iron. (*Id.*) She has help with heavy work like moving furniture. (*Id.*) Smith can take care of herself and drive an automobile, but shops for food in the early morning. (*Id.*) In addition, Smith testified that she can sit for 45 minutes on a good day before she feels her knees tightening up and her thighs starting to cramp. (Tr. 33.)

Smith further testified that she can walk from the front door to the mailbox but that it takes ten minutes. (Tr. 33.) She will occasionally use a cane. Also, she can lift her 22 pound grandson but most of the time she will sit down to pick him up because she doesn't have as far to lift him. (Tr. 34.) Smith testified that she has less control of her hands, which slowed her ability to do needlepoint, and hand cramping, hand numbness, and fatigue. (Tr. 36.)

The ALJ disagreed with the Department of Disability Service's determination that Smith did not have severe impairments and found that she did have severe fibromyalgia. However, the ALJ determined that her high blood pressure was well controlled with medication, that her depression was situational, and that her diverticulitis was not an impairment for the twelve continuous months from her alleged onset date of June 1, 2004, through her date last insured of September 30, 2009. (Tr. 16.) Accordingly, the ALJ concluded that Smith could perform light work based, in part, on Smith's testimony that she could lift and carry her 22 pound grandson and the VA's functional capacity assessment supported that finding. In addition, Smith would be precluded from more than occasional stooping, bending, crouching and from any climbing, crawling, or kneeling. In determining these limitations, the ALJ gave Smith "the benefit of a lot of doubt" and accorded "undue weight to intermittent medical reports of joint aches and diffuse tenderness." The ALJ

5

concluded that Smith was capable of past work as a waitress and data entry clerk citing the testimony of the vocational expert and the Dictionary of Occupational Titles. (Tr. 18.)

ANALYSIS

As an initial matter, Smith challenges the residual functional capacity assessment finding she is capable of performing light work with occasional stooping, bending, and crouching with no climbing, crawling, or kneeling. (Tr. 16.) Smith maintains that the ALJ improperly based her residual functional capacity on her ability to lift and carry her 22 pound grandson and the VA's functional capacity assessment when neither reason supports a finding of light work. In addition, the ALJ failed to discuss the other strength demands such as sitting, standing, walking, carrying, pushing, or pulling as required by SSR 96-8p.

In determining an individual's RFC, an ALJ must evaluate all limitations that arise from a medically determinable impairment and may not ignore a line of evidence contrary to the ruling. *See Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009). The RFC determination should include a discussion of how the evidence, objective and subjective, supports the ultimate conclusion. *Conrad v. Barnhart*, 434 F.3d 987, 991 (7th Cir. 2006); *Briscoe v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005). Social Security Ruling 96–8p instructs ALJ's to assess a claimant's work-related abilities on a function-by-function basis, and to articulate, "at some minimum level," the analysis of the evidence. *Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005).

Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. 20 C.F.R. § 404.1567(b). Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and

6

pulling of arm or leg controls. *Id.* To be considered capable of performing a full or wide range of light work, an individual must have the ability to do substantially all of these activities. *Id.*

After reviewing the record, the court finds that the RFC assessment is not supported by substantial evidence. Initially, the ALJ disagreed with the Administration and Dr. Cole's conclusion that Smith did not have severe impairments, and found that Smith has severe fibromyalgia. However, he noted that Smith's statements concerning daily activities and the use of amitriptyline were "largely belied by the records" and cited selective medical records indicating that she tolerated the medicine well, walked around the yard, returned to typing school, and exhibited a full range of motion in arms and legs.

The ALJ explained that he set the RFC based on Smith's testimony "that she could lift and carry her 22 lb. grandson," and the VA's functional capacity assessment. However, Smith never testified that she could carry her grandson and it does not appear that the VA's assessment measured her ability to lift and carry on a regular basis. When asked by the ALJ how much she could lift regularly, Smith answered that she can lift her 22 pound grandson as long as she doesn't do it all day long. (Tr. 34.) She further testified that "most of the time" she would sit down to pick up her grandson because she doesn't have as far to lift him. She never testified about her ability to carry her grandson, particularly on a regular basis.

Moreover, the VA's functional assessment report cited by the ALJ finds that Smith "may be capable of LIGHT-MEDIUM WORK with opportunities for seated rest." (Tr. 228.) However, that report does not support a finding that Smith can "frequently" lift or carry objects during an eight hour day, and the same report noted a -24% deficit in her ability to walk 300 yards in 82 seconds and a reduction in Smith's fine prehension and dexterity.

7

Johnston's bilateral lifting test measured strength over two repetitions, and her push/pull endurance for 4 minutes 27 seconds.

The report says nothing about Smith's ability to sit or stand. Smith testified that it takes ten minutes to walk from the front door to the mailbox across the street, that she needed to rest for five-to-ten minutes when walking from one end of the house to the other and that she uses a cane occasionally. Although the ALJ referenced Smith's testimony that she could sit for about 45 minutes and walk for short distances, there is no explanation as to how medical evidence undermined her testimony regarding her ability to sit or stand during an eight hour day.

For similar reasons, the court will remand the ALJ's findings regarding Smith's ability to perform past relevant work as a waitress and data entry clerk. The ALJ asked Smith what would prevent her from doing her past jobs, and Smith replied that her hands cramp up when she tries to do something as simple as type an e-mail. She also testified that she quit the waitress position because her arms and legs were giving out on her, she could no longer carry plates, and that her hands go numb. When the vocational expert asked Smith about her past work as a data processor in a laboratory, Smith testified that she sat six hours a day. In that same hearing, she testified that she can no longer sit for more than forty-five minutes on a good day. The ALJ never discussed the physical and mental demands of the past relevant work as required by SSR 82-62[1] and never discussed Smith's testimony in this

---

[1] SSR 82–62 explains that: "Determination of the claimant's ability to do PRW requires a careful appraisal of (1) the individual's statements as to which past work requirements can no longer be met and the reason(s) for his or her inability to meet those requirements; (2) medical evidence establishing how the impairment limits the ability to meet the physical and mental requirements of the work; and (3) in some cases, supplementary or corroborative information from other sources such as employers, the *Dictionary of Occupational Titles*, etc., on the requirements of the work as generally performed in the economy."

respect. Instead, the perfunctory analysis relied solely upon the vocational expert's testimony that the past work as a data entry clerk required sedentary exertion and Smith's past relevant work as a waitress required light exertion. *See Nolen v. Sullivan*, 939 F.2d 516, 518-19 (7th Cir. 1991)((holding that the ALJ should have listed and described the tasks that the claimant's prior work entailed, rather than defining the work in general terms, such as unskilled at light exertional level).

As a final matter, Smith challenges the ALJ's credibility determination. Although the case is being remanded on other grounds, it must be noted that the ALJ's decision relies on the "meaningless boilerplate" language so often criticized in this circuit. *Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012). Finding that "statements concerning the intensity, persistence, and limiting effects" of Smith's symptoms were "not credible to the extent they are inconsistent with" the judge's assessment of her residual functional capacity" is unhelpful. *Bjornson v. Astrue*, 671 F.3d 640, 644–45 (7th Cir. 2012). As has been explained repeatedly by the Seventh Circuit, it backwardly "implies that the ability to work is determined first and is then used to determine the claimant's credibility." *Bjornson*, 671 F.3d at 645. Now, therefore,

IT IS ORDERED that the decision of the Commissioner is reversed.

IT IS FURTHER ORDERED that this case is remanded to the Commissioner for further proceedings.

Dated at Milwaukee, Wisconsin, this 7th day of August, 2012.

BY THE COURT

/s/ C. N. Clevert, Jr.
C. N. CLEVERT, JR.
CHIEF U. S. DISTRICT JUDGE